Filed 7/30/14  P. v. Keever CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>TERRY PAUL KEEVER,<br><br>    Defendant and Appellant. | F066553<br><br>(Tuolumne Super. Ct.<br>No. CRF38617)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Eleanor Provost, Judge.

John Hardesty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Barton Bowers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Terry Paul Keever was charged and convicted of a felony violation of Penal Code[1] section 148.1, subdivision (d), unlawfully and willfully sending or causing to be sent a false bomb. He was sentenced to the second strike term of 10 years. The conviction was based on an incident where a fake bomb was found outside the Tuolumne County Courthouse. Defendant's DNA was found on the black electrical tape wrapped around the device.

On appeal, defendant contends his constitutional rights to due process and a fair trial were violated because the trial judge, prosecutor, bailiff, court reporter, and court clerk were "victims" of the fake bomb, and the evacuation of the same courthouse where he was tried. He also contends that every resident of Tuolumne County was a victim of fear engendered by the fake bomb, which meant the jurors selected in his case were victims of the charged offense.

As we will explain, defendant failed to move for a change of venue or make any of the objections he now raises on appeal, and there is no evidence to support any of his contentions. We affirm.

## FACTS

### Discovery of the false bomb

On November 28, 2011, Charles Combs worked for a private company that assisted the sheriff's department with security for the Tuolumne County Courthouse, located on West Yaney in Sonora. Combs screened employees and the public as they entered the courthouse. Combs testified it was particularly busy that morning.

Around 8:40 a.m., someone advised Combs there was a package in front of the courthouse. It was still very busy, and Combs continued to screen people until there was

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

a break in the rush. He went outside and found a bag in plain sight, about five feet beyond the entryway.

In violation of security protocol, Combs brought the bag into the courthouse and ran it through the X-ray machine. The contents looked suspicious, like a starter and a power supply. Combs left it on the X-ray machine and called a deputy sheriff.

Tuolumne County Sheriff's Deputy Brandon Green arrived at the X-ray machine. He looked on the screen and saw a box and wires. He opened the bag and saw three long, black cylindrical objects which were wrapped in tape, with a wire coming out from the middle and going into a black box.

Deputy Green thought it was an explosive device and immediately took the bag outside the courthouse. He placed it by a cement wall along the street, notified his superiors, and kept the area clear.

Around 9:15 a.m., the courthouse was evacuated because of the device.

At 9:40 a.m., Calaveras County Sheriff's Detective Josh Crabtree responded to the courthouse lawn where Green had placed the bag. Crabtree served with the bomb squad. Crabtree learned that someone had already moved the package and it had not exploded, which meant it was not a victim-activated device.

Detective Crabtree testified the device was inside a grocery bag. He opened the bag and found three road flares wrapped together with black electrical tape. There was a computer cord "like you have hooked up to your laptop," with the top shaved off to simulate a time fuse. The cord was attached to a power box.

Based on his experience, it was immediately apparent to Detective Crabtree that the device in the bag was not an explosive. The courthouse reopened around 10:45 a.m.

Detective Crabtree took the device to the investigations office. He used gloves to disassemble the components. He unwrapped the black electrical tape and noticed there were fibers on the tape, similar to material from a sweater or carpet. He put the electrical tape and fibers in separate Ziploc plastic bags, and preserved the other parts for analysis.

3.

**Defendant is remanded into custody**

Around 3:45 p.m. on November 28, 2011, the same day as the bomb scare, defendant appeared in court as scheduled on an apparently unrelated matter, and he was remanded into custody in the jail.

**Defendant contacts the police**

On February 29, 2012, defendant called Sergeant Vanderwiel of the Sonora Police Department and said he had information about the November 2011 bomb scare. Defendant said he also had information about the arson of patrol cars from the sheriff's department, which happened a few days after the bomb scare. Defendant said he was in custody at the jail, but he was on a day-pass for medical reasons and wanted to meet with Vanderwiel that day.

Sergeant Vanderwiel met with defendant that day. Defendant said that while he was serving time in jail, "he overheard two other inmates bragging about doing the arson to the patrol vehicles. He also told me that one of them had also admitted to leaving the fictitious bomb at the courthouse." Defendant said one of the inmates was named "Travis," and the inmates discussed someone named "T.N.T. Mike" as someone involved in the arson.

Defendant said he wanted an early release from jail in exchange for cooperating with the police. Defendant offered to work with Sergeant Vanderwiel and try to tape-record a statement from the inmates.

On March 15, 2012, Sergeant Vanderwiel met with defendant in the jail. Defendant said the culpable inmate's name was "Travis Veysey." According to defendant, Veysey said he was responsible for the fake bomb, and it was in a bag which

4.

said, "Have a nice day."**2**  Defendant also said that "Jeremy Snead" was involved in the arson of the patrol cars.

As a result of Sergeant Vanderwiel's meeting with defendant, Sergeant Ford of the Tuolumne County Sheriff's Department also met with defendant in jail.  Ford was investigating the arson of the patrol cars and was advised that defendant said he had information about the crime.  Defendant told Ford that he did not have any information about the arson, but "if he were to get out of jail, that he could probably get information regarding that for us."  Ford believed defendant just wanted to be released from custody. Ford did not have further conversations with him.

## Discovery of defendant's DNA

After Sergeant Vanderwiel met with defendant, he sent the package with the fake bomb components to the Department of Justice for analysis.**3**  A criminalist examined the black electrical tape that had been wrapped around the road flares.  A unique DNA profile was generated from a swab taken from the tape.

The criminalist entered the DNA profile in the Combined DNA Index System (CODIS), and a "cold hit" matched the profile to defendant, whose DNA profile was already in the database.

On June 15, 2012, Sergeant Vanderwiel was advised about the "cold hit" of defendant's DNA profile on the electrical tape.

On June 16, 2012, Sergeant Vanderwiel visited defendant in jail.  Vanderwiel told defendant "that I did have a suspect in the case based on D.N.A. evidence, and I advised

---

**2** At the preliminary hearing, Sergeant Vanderwiel testified the canvas bag which contained the fake bomb had printed on it:  " 'Have a pleasant day.' "

**3** At the preliminary hearing, Sergeant Vanderwiel testified that he determined "T.N.T. Mike" was "Michael Davis."  He sent the fake bomb components to the Department of Justice for analysis because he hoped to find Davis's DNA on the pieces to determine whether he could build a case against him.

5.

him that it was him." Defendant immediately had a "deer in the headlight look." He became "a little bit visibly nervous and he denied involvement. He told me that he was in custody at the time so it couldn't have been him." Defendant repeated that " '[i]t couldn't have been me; I was in custody.' "

Sergeant Vanderwiel checked the jail records and determined defendant appeared in court and was remanded into custody at 3:45 p.m. on November 28, 2011 – several hours after the fake bomb had been found at the courthouse at 8:40 a.m.

Sergeant Vanderwiel again met with defendant in jail and advised him that he was not in custody when the fake bomb was found. He asked defendant to explain how his D.N.A. was on the device. Defendant said it couldn't have been his DNA because he was in custody. Defendant also said he must have been set up.

A sample of defendant's DNA was obtained. The criminalist who examined the black tape compared defendant's known DNA sample with the profile generated from the tape and again determined they matched.

As for the separate incident of the arson of the patrol cars, Sergeant Vanderwiel testified Samuel Shockley subsequently pleaded guilty to that crime. Defendant never gave Shockley's name, and no one named "T.N.T. Mike" or Jeremy Snead was implicated in the arson. The arson was apparently unrelated to the fake bomb.

### DEFENSE

Eugene Salvetti testified he lived in Sonora. He had known defendant for three or four years. Salvetti used to live across the street from a garage that defendant rented and used for storage. Salvetti testified defendant's garage was full of tools, car parts, fishing gear and junk. It had been burglarized several times, and sometimes defendant forgot to close and lock the door. Salvetti did not know when these incidents occurred, if anything was taken from the garage, or if defendant reported the thefts to the police.

6.

Salvetti testified that on November 28, 2011, he was living elsewhere in Sonora. He was listening to his police scanner early that morning and heard about the bomb scare at the courthouse.

About 10 to 15 minutes after Salvetti heard about the bomb scare, defendant called Salvetti and asked if he could come by his house on his way to court. Salvetti believed defendant was at home when he made this call because he heard him talking to his girlfriend while he was on the phone.

Salvetti testified he told defendant there was a bomb scare at the courthouse, they were looking at a backpack, and the bomb squad had been called. Salvetti testified that during the call, he thought defendant "talked to his girlfriend and, you know, they kind of had a little laugh about it .…" "[T]hey thought it was kind of humorous that, you know, things might change" because they had their schedule planned, and "the bomb squad is surrounding the courthouse .…" Salvetti testified that defendant was supposed to be in court that day, but "it might be put off for hours. [I]t was just humorous that there was a bomb at the courthouse the day he is supposed to go to court and, you know, I think I joked about, 'Yeah, it's just your luck,' you know?" Salvetti testified defendant and his girlfriend, Donna Ratliff, arrived at his house about an hour after the phone conversation.

Donna Ratliff testified that she had lived with defendant for over 16 years. Ratliff testified defendant's storage garage had been burglarized a few times over the years. In February 2011, Ratliff told defendant they couldn't afford to pay rent on the garage anymore, and told him to get rid of the contents. Defendant had some garage sales, gave away some things, and threw away a lot of belongings.

Ratliff testified defendant was scheduled to report to jail at 1:00 p.m. on November 28, 2011. Ratliff woke up that morning between 7:00 a.m. and 8:00 a.m., and defendant was at home. Defendant worked outside while she had coffee. They went to Salvatti's house on the way to jail. They used Ratliff's truck because defendant's vehicle was not working. Ratliff did not believe defendant used her truck earlier that morning,

7.

and she did not usually allow him to drive it. Ratliff did not recall talking about the bomb incident or laughing about it with defendant.[4] Ratliff admitted she had been convicted of possession of stolen property in 2002.

**Rebuttal**

Sergeant Vanderwiel testified there were no reports of burglaries or thefts from defendant's rented garage.

## THE TRIAL

Defendant was charged with a felony violation of section 148.1, subdivision (d), unlawfully and willfully sending or causing to be sent a false bomb, with one prior strike conviction and four prior prison term enhancements. His maximum exposure was 10 years. Prior to trial, the prosecution offered a negotiated disposition of four years. Defendant refused. The court strongly encouraged defendant to reconsider his refusal, and reminded defendant about his maximum exposure and that there was DNA evidence in this case. The court granted a recess so he could speak to his attorney. Defendant again refused the offer and the case continued to trial.

Also prior to trial, defendant admitted the prior conviction allegations: First degree burglary with a firearm enhancement in 1980 (§§ 459, 12022.5); two counts of receiving stolen property in 1994 (§ 496, subd. (a)); petty theft with a prior and failure to appear in 1998 (§§ 484/666, 1320.5); receiving stolen property and burglary in 2002 (§§ 496, 459); and petty theft with a prior in 2007.

---

[4] The prosecutor moved to introduce possible impeachment evidence about Donna Ratliff's credibility. The prosecutor stated defendant had been convicted of domestic violence after he severely beat Ratliff, but she resumed living with him after the incident. The prosecutor argued the domestic violence evidence and their reconciliation was relevant to impeach Ratliff's credibility about defendant's alibi, and show that Ratliff would say anything to help defendant. The court denied the prosecution's motion and excluded the evidence.

After a jury trial, defendant was convicted as charged, and he was sentenced to the second strike term of 10 years.

## DISCUSSION

### I.    Change of Venue

We begin with defendant's assertion that it was impossible for him to receive a fair trial in Tuolumne County because of the nature and circumstances of the charged offense, that he was tried and convicted in the same courthouse where the fake bomb was planted and found, and everyone involved in the prosecution of his case – the judge, the prosecutor, the bailiff, the clerk, and the court reporter – were victims of the crime and the subsequent evacuation of the building.

Defendant was charged and convicted of a felony violation of section 148.1, subdivision (d), which states:

> "Any person who maliciously gives, mails, sends, or causes to be sent any false or facsimile bomb to another person, or places, causes to be placed, or maliciously possesses any false or facsimile bomb, with the intent to cause another to fear for his or her personal safety or the safety of others, is guilty of a crime punishable by imprisonment in a county jail not to exceed one year, or pursuant to subdivision (h) of Section 1170."

Defendant declares the nature of the charged offense "inherently provoke[d] sustained fear in its direct victims – and in the general public – because everyone is highly familiar and uniquely afraid of a bomb's explosive properties." "The combination of the nature of this offense and the location where the false bomb was found meant that everyone working in the courthouse was a direct victim of the crime." Defendant further asserts:

> "Neither the judge (nor the prosecutor, clerk, reporter or bailiff) in the instant case was likely to be neutral after being victims of a false bombing attributed to [defendant] ….  The judge, along with the others, necessarily felt the sustained fear, alarm, and disorder that is inherent in any bomb threat.  Not only was there a threat of a bomb in this case, but, more tangibly, it was known that a package had been found containing what

9.

appeared to be an explosive device.  That fear was made more palpable by the forced evacuation of the entire courthouse.  No one present could fail to be frightened, annoyed, and angered by the planting of a putative explosive device at their workplace."

Defendant argues that every resident of Tuolumne County was a "victim" of the offense, and the county residents who were selected as jurors in this case were also "victims" of the fake bomb since they "could not escape" the "inherent and public atmosphere of fear" which resulted from the discovery of the fake bomb.  "The instant jurors were indirect victims as members of the general public who are considered highly familiar with and uniquely afraid of bombs and who could have been, or at least could imagine themselves to have been, walking or driving past the courthouse or sitting in the jury box when a bomb was discovered."  "It was their courthouse and their public streets that were threatened and actually disrupted.  The jurors were sitting in a jury box located in the threatened courthouse."

All of defendant's allegations should have been raised by a change of venue motion.  A trial court should grant a motion for a change of venue when publicity has created a "reasonable likelihood" the defendant will not receive a fair trial in the county. (§ 1033, subd. (a).)  "The phrase 'reasonable likelihood' in this context 'means something less than "more probable than not," ' and 'something more than merely "possible." ' [Citation.]"  (*People v. Proctor* (1992) 4 Cal.4th 499, 523.)  The defendant has the burden of proving more than a mere possibility of unfairness.  (*People v. Jenkins* (2000) 22 Cal.4th 900, 943.)  In assessing the motion, the trial court considers the gravity and nature of the crime, the extent and nature of the publicity, the size of the community, and the status of the victim and the accused.  (*Ibid.*)  Such a motion should be supported by appropriate exhibits regarding the relevant factors, particularly press reports and other evidence about pretrial publicity.  (See, e.g., *People v. Farley* (2009) 46 Cal.4th 1053, 1081, 1083–1084.)

Defendant's due process claims are meritless on the record before this court and are based on nothing but speculation.  His failure to move for a change of venue, which presumably would have been accompanied by the appropriate supporting exhibits, is fatal to his due process claims and forfeits appellate review of the issue.  (See, e.g., *People v. Simon* (2001) 25 Cal.4th 1082, 1103–1104, 1107.)  There is nothing in the appellate record to indicate the nature or circumstances of any news reports about the fake bomb, the effect of the discovery of the bomb on the general public and/or the courthouse staff, or even if the trial judge, the prosecutor, and any members of the public who were ultimately selected to sit on his jury were in the courthouse at the time the fake bomb was discovered, or suffered any type of impact or reaction from the event.

As we will address in section III, *post*, the only reference to pretrial publicity was defense counsel's statement prior to jury selection that there had been one news article about the fake bomb; defendant interjected that there were two news stories.  Nevertheless, there is no evidence in the appellate record about the specific nature and content of these news reports or public reaction, if any, and, as we will discuss below, the court asked the potential jurors about their possible exposure to any news reports during voir dire.

### *Turnage and other bomb-related cases*

While defendant lacks any evidence in the record to support his due process claims about venue, he has instead cited to *People v. Turnage* (2012) 55 Cal.4th 62 (*Turnage*) for the proposition that defendant was tried for an offense that exploited "the public's *fear* of bombs, and that predictably provoke havoc and alarm."  (*Id.* at p. 72, italics in original.)  In that case, the defendant was convicted for violating section 148.1, subdivision (d), after he planted a fake bomb near a government building.  On appeal, defendant claimed his felony conviction for violating section 148.1 violated his equal protection rights compared to an entirely different statute, section 11418.1.  "The latter provision provides, in pertinent part, that anyone who places 'any false or facsimile of a

weapon of mass destruction' (WMD) with the intent to cause fear in others is guilty of a misdemeanor. A violation of section 11418.1 (or the false WMD statute) may be punished as a felony only '[i]f the [perpetrator's] conduct causes another person to be placed in sustained fear' – an element not necessary under the false bomb statute for either misdemeanor or felony punishment." (*Id.* at p. 67.) The appellate court agreed with the defendant's equal protection claim. (*Ibid.*)

In *Turnage*, the California Supreme Court disagreed with the appellate court and held no equal protection violation occurred. (*Turnage*, *supra*, 55 Cal.4th at p. 67.)

> "The challenged distinction – allowing false bomb crimes to be punished as felonies without proof of sustained fear, while requiring such a showing for felony violations of the false WMD statute – is not irrational. The Legislature could reasonably assume that the public is highly familiar with, and uniquely afraid of, the explosive properties of bombs. Hence, mere observation or awareness of an object that looks like a bomb, and that was meant to instill fear like a bomb, is almost certain to cause the alarm and disorder associated with sustained fear under the statutory scheme.
>
> "Upon close examination, the same reasoning does not apply to false WMD's. A WMD is statutorily defined to include a vast array of chemical and biological substances, and radioactive and mechanical devices, weaponized for use in both conventional and unconventional forms against all kinds of targets, not just people. It is conceivable from a legislative perspective that, given the breadth and relative novelty of WMD's, a facsimile of a WMD would not *necessarily* be recognized or cause fear, even where it is detected and was intended to do so. Requiring sustained fear for felony offenses under the false WMD statute, but not the false bomb statute, promotes a valid state interest in deterring and punishing the societal harm such crimes clearly cause." (*Id.* at pp. 67–68, italics in original.)

In the course of *Turnage's* equal protection analysis, the California Supreme Court reviewed the history of section 148.1, subdivision (d), and noted there was no statutory definition of the term "bomb." (*Turnage*, *supra*, 55 Cal.4th at p. 71.)

> "Courts have explained that the Legislature is presumably aware of the manner in which bombs are used, and the frequency with which bombings occur. [Citation.] Everyone is assumed to 'know what a bomb is.'

[Citation.] In fact, bombs are commonly understood to be so 'inherently dangerous' [citation] that possession can be unlawful 'even when [the device is] *not* set to explode.' [Citation.] Detonation can occur unexpectedly, while the object is concealed or if the bomber loses control over it, threatening intended and unintended victims alike. [Citation.] [¶] Because of these known dangers, section 148.1 has long prohibited various acts that exploit the public's *fear* of bombs, and that predictably provoke havoc and alarm.…" (*Ibid.*, italics in original.)

In addition to *Turnage*, defendant also cites to two matters outside the record in support of his claim that it was impossible to receive a fair trial in Tuolumne County for the charged offense: An Internet citation to an article in the "Union Democrat" newspaper about the fake bomb; and an Internet citation to an article by Alan Dershowitz in "The Guardian" about the Boston Marathon bombing, with the quote that "virtually every Bostonian regards himself or herself as a victim of this horrendous crime."

Based on *Turnage* and the two extraneous sources, defendant asserts it was impossible for him to receive a fair trial in Tuolumne County because of the nature of the crime, and the certainty the general public would have reacted in the same way as the citizens of Boston after the bombing occurred in that city. Defendant asserts a change of venue should have been ordered even though he never made such a motion.

As we have already explained, these are issues which could have been explored in a motion for change of venue with appropriate supporting exhibits. Defendant's reliance on *Turnage's* description of the offense could well have applied to the members of the general public sworn as a jury in any county to hear a case about a fake bomb in a public place. As we will explain in section III, *post*, the superior court took appropriate steps to ensure defendant received a fair trial by questioning the prospective jurors about this issue during voir dire.

We further note that courts have exercised discretion to deny venue-transfer motions in well known and notorious cases involving substantial pretrial publicity and community impact, most notably the trial of the conspirators in the 1993 bombing of the World Trade Center in New York City. (See *United States v. Yousef* (2nd Cir. 2003) 327

13.

F.3d 56, 78, 155–156.)  The mere fact that defendant was charged with planting a fake bomb did not mean that it was impossible for him to receive a fair trial in the community where the incident occurred.  Based on the record before this court, there is no evidence that defendant's due process rights were violated.

### *Ineffective assistance*

In the alternative, defendant argues his defense attorney was prejudicially ineffective for failing to make whatever motions were required to effectuate these results. To prevail on an ineffective assistance claim, "defendant must first show that ' "counsel's representation fell below an objective standard of reasonableness … under prevailing professional norms." ' [Citation.]  Second, defendant must show that the inadequacy was prejudicial, that is, ' "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' [Citation.]  [¶]  If 'counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' [Citation.]  When, however, the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons.  To engage in such speculations would involve the reviewing court ' "in the perilous process of second-guessing." ' [Citation.]  Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, rather than on appeal.  [Citations.]" (*People v. Diaz* (1992) 3 Cal.4th 495, 557–558.)

As we have already explained, there is no evidence in the appellate record to support defendant's due process contentions, or to show that a motion for change of venue should have been filed or would have been successful.  Based on the record before

this court, defense counsel was not ineffective for declining to bring a meritless motion. (*People v. Diaz*, *supra*, 3 Cal.4th at p. 562.)

## II.     Forfeiture/waiver

Defendant concedes he did not object to venue, the trial judge, or any aspect of the criminal proceedings.  However, defendant asserts he has not forfeited or waived appellate review of his due process contentions because "the facts are undisputed and raise important issues of public concern, namely whether California will allow its criminal jurisprudence to sink to the level of promoting expediency at the expense of a defendant's right to due process and a fair trial."

Defendant contends the "objective evidence" demonstrates he was tried by an "unfair tribunal presided over by a victim of the crime," and there was a reasonable probability the jurors were exposed to "prejudicial events outside the trial evidence" because the fake bomb "created an inherent and public atmosphere of fear that the jurors could not escape."

Despite his failure to preserve these issues, we will explain how the trial court ensured his constitutional rights to due process and a fair trial were preserved.

## III.     Jury selection

The federal and state Constitutions guarantee criminal defendants a fair trial by a panel of unbiased, impartial jurors.  (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *People v. Roldan* (2005) 35 Cal.4th 646, 689, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  "A prospective juror's ability to be fair and impartial is explored during the process of voir dire," which may result in challenges for cause or peremptory challenges based on the prospective juror's responses. (*People v. Duran* (1996) 50 Cal.App.4th 103, 111; e.g., *People v. Valdez* (2012) 55 Cal.4th 82, 165; *People v. Carasi* (2008) 44 Cal.4th 1263, 1325.)

Defendant repeatedly complains that his due process rights were violated because the jury was biased against him, without any evidence to support these claims. In making these arguments, however, he fails to account for what actually happened on the record.

Just before the beginning of jury selection, the prosecutor advised the court that the newspaper had covered the fake bomb threat, and the issue should be addressed during voir dire to determine if the potential jurors heard about it. The court asked the parties whether it should also ask the potential jurors about the arson of the patrol cars, even though it was not related to the fake bomb and defendant was not charged with that offense. Defense counsel agreed the court should ask about the arson and the fake bomb since both incidents were going to be addressed during trial.[5]

The court stated it would ask the potential jurors about both incidents, and noted the arson of the patrol cars "got a lot of coverage, probably more than" the fake bomb. Defense counsel replied the arson received "[m]uch more" coverage, and she thought there was only one article about the fake bomb. Defendant interrupted and said there were two articles about his case. Defense counsel did not introduce any newspaper reports or evidence about any media reports about the fake bomb into evidence, and they were not referred to again.

Defendant did not request the transcription of the voir dire proceedings for purposes of appeal. Based on our review of the minute order for voir dire, however, there is no evidence that these two topics prevented the court and the parties from agreeing on the selection of a jury. Defendant did not object to the voir dire process or to the jurors who were ultimately selected and sworn. If defendant had been concerned about the

---

[5] As explained in the factual statement above, Deputy Vanderwiel testified defendant contacted him and claimed he had information about who was responsible for both the fake bomb and the apparently unrelated arson of several patrol cars. Vanderwiel also testified that someone else was convicted for the arson of the patrol cars, and defendant was not involved in that case.

16.

outcome of voir dire, he could have moved for a change of venue after the conclusion of jury selection and argued that voir dire showed that it was impossible to receive a fair trial in Tuolumne County. (See, e.g., *People v. Farley* (2009) 46 Cal.4th 1053, 1085.) Defendant's failure to make a motion for change of venue, either before or after voir dire, constitutes his forfeiture of that issue. (*People v. Bolin* (1998) 18 Cal.4th 297, 312–313.)

Defendant asserts that defense counsel was prejudicially ineffective for failing to make the necessary motions to preserve his appellate contentions. Based on the record before this court, however, defense counsel was not ineffective for declining to bring an apparently meritless motion. (*People v. Diaz*, *supra*, 3 Cal.4th at p. 562; *People v. Bolin*, *supra*, 18 Cal.4th at p. 314.)

## IV. <u>Neutral and detached magistrate</u>

As noted above, defendant insists his failure to object to the trial judge or move for a change of venue has not resulted in forfeiture or waiver of his due process contentions because he was tried by an "unfair tribunal presided over by a victim of the crime" and, as a result, this state's criminal jurisprudence has sunk "to the level of promoting expediency at the expense of a defendant's right to due process and a fair trial."

"[A] defendant has a due process right to an impartial judge, and … violation of this right is a fatal defect in the trial mechanism." (*People v. Brown* (1993) 6 Cal.4th 322, 333.) Thus, a defendant has a right to a trial "before a judge with no actual bias against the defendant or interest in the outcome of his particular case…." (*People v. Harris* (2005) 37 Cal.4th 310, 346; see also *Bracy v. Gramley* (1997) 520 U.S. 899, 904–905.)

When judicial bias is raised as an issue on appeal, the "role of a reviewing court 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a

fair, as opposed to a perfect, trial. [Citation.]' [Citation.]" (*People v. Harris, supra*, 37 Cal.4th at p. 347.)

There is no evidence in the appellate record to show the trial judge had any actual or implied bias against defendant, or that defendant was not tried before a neutral and detached magistrate. There is no evidence the trial judge in this case was in the courthouse when it was briefly evacuated because of the fake bomb, the judge was a witness to the incident, or that the discovery of the fake bomb and evacuation had a particular impact which would have raised questions about the trial judge's impartiality. The court did not make any comments indicating a personal interest, particular knowledge, or sensitivities about the case. The court did not make any rulings or engage in any conduct to manifest bias in the presentation of evidence, usurp the duties of the prosecutor, or create the impression it was allied with the prosecution. (*People v. Harris, supra*, 37 Cal.4th at p. 346.)

Defense counsel was well aware of the circumstances of the charges against defendant. Defense counsel was also aware of the appropriate procedures to disqualify a judge. At the beginning of the criminal proceedings, defense counsel moved to disqualify Judge Boscoe, who was originally assigned to the case, pursuant to Code of Civil Procedure section 170.6. When Judge Provost was assigned, defense counsel did not raise any objections, attempt to disqualify her from presiding over defendant's case, or challenge her for cause or bias.

The entirety of the record refutes defendant's general assertions and claims of certainty the trial judge was biased against him. The court denied the prosecution's motion to impeach defendant's girlfriend with defendant's prior act of domestic violence against her, agreed with defendant that the evidence was prejudicial, and granted the defense motion to exclude this evidence. The court also granted defendant's motion not to impose any sanctions against the defense for possible violations of the discovery order. More importantly as to the issues raised by defendant, the court recognized the

18.

importance of questioning the prospective jurors about their possible exposure to news stories about either the fake bomb or the arson of the patrol cars.

There is no evidence that defendant was not tried before a neutral and detached magistrate. As with defendant's other issues, defense counsel was not ineffective for failing to challenge the trial judge given the absence of any evidence to support that challenge. (*People v. Diaz*, *supra*, 3 Cal.4th at p. 562.)

## V. Prosecutorial misconduct

Finally, defendant contends the prosecutor committed prejudicial misconduct during trial by referring to facts not in evidence about the fake bomb. As we will explain, defense counsel did not object to these instances and the context of the prosecutor's remarks refutes any claim of misconduct.

### A. Background

The prosecutor's first witness was Charles Combs, the private security guard who found the fake bomb. The prosecutor asked Combs several questions to verify that he worked in "this courthouse," and he contacted Deputy Green in the bailiff's area of Department 2 and told him about the suspicious package.

In closing argument, the prosecutor stated:

> "We know that this bag with this device is located outside of the courthouse at 8:40 in the morning on November 28th. And we know that at 9:15, the decision is made to evacuate the courthouse. *We were all evacuated out*. The bomb squad arrives at 9:20 and determines it is a fake bomb. So at 10:45, *we're allowed to come back into court and resume our business*. The defendant is set for sentencing, actually, at 1:30 that day." (Italics added.)

Defense counsel did not object to any of these incidents.

### B. Analysis

We begin with the well settled law on prosecutorial misconduct. "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.'

19.

[Citations.]  In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'  [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'  [Citations.]"  (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

Defendant cites the italicized portion of the prosecutor's closing argument and argues the prosecutor committed misconduct.  "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.  [Citation.]"  (*People v. Price* (1991) 1 Cal.4th 324, 447; *People v. Silva* (2001) 25 Cal.4th 345, 373.)

Defense counsel did not make prosecutorial misconduct objections or request admonitions to any of the instances which defendant now raises on appeal, which precludes his appellate claims of misconduct.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000; *People v. Cain* (1995) 10 Cal.4th 1, 48.)

In the alternative, defendant claims counsel was prejudicially ineffective for failing to preserve the objections because the prosecutor's comments made the jury understand "it was not some other courthouse that was threatened but their courthouse, the very one in which they were sitting in judgment of the false bomber.  It would take a superhuman effort to resist thinking of one's own reaction under the threat allegedly imposed by [defendant]."

The prosecutor's closing argument cited to admissible evidence about the fake bomb incident, and was not based on any facts outside the record.  As we have already explained, defendant failed to move for a change of venue supported by appropriate exhibits to support his claims about the alleged impossibility of obtaining a fair trial in Tuolumne County, or that the trial judge was not neutral and detached.  Defendant has also failed to account for the trial judge's decision to question the prospective jurors

20.

about their possible exposure to any pretrial publicity about the fake bomb, and the absence of any objections to the jurors who were ultimately selected and sworn in this case.

We similarly conclude that defense counsel was not prejudicially ineffective for failing to object to the prosecutor's isolated comments about the nature and circumstances of the charged offense.

## **DISPOSITION**

The judgment is affirmed.

_____
Poochigian, J.

WE CONCUR:


_____
Levy, Acting P.J.


_____
Peña, J.

21.